SILAS W. ROBBINS, Plaintiff in Error, *v.* THOMAS LASWELL, Defendant in Error.

ERROR TO SANGAMON.

When by agreement, persons have a joint interest of the same nature in a particular adventure, they are, as between themselves, partners; although some contribute money alone, and the others labor alone.

If parties agree to share profits, they are partners as to such profits; although they do not agree to share in the losses.

A written agreement as to dividing profits may be extended tacitly by the mutual understanding of the parties, or by their conduct in relation to it.

THIS was a suit in chancery, filed in the Sangamon Circuit Court, for the settlement of a partnership business founded upon the following agreement:

" Memorandum of an agreement, made this 1st day of March, 1853, between Silas W. Robbins, of the first part, and Thomas Laswell, of the second part : Witnesseth, that the said Robbins, party of the first part, has this day advanced to said

Laswell, party of the second part, two hundred and fifty-four dollars, to buy young cattle, heifers, steers, yearlings, etc., with, and said Laswell is to feed, salt, handle and manage said stock well in every respect, and to have proper oversight and care in regard to said stock during the next grass season, and if not sold in the fall for small beeves or otherwise, said Laswell is to winter well the next winter, and have them in good order to go on the grass of the spring of 1854, and said Laswell is to sell them all in one year from this date, if deemed practicable, and is to be at all expense and trouble in feeding and salting said stock, supposed to be about forty head, and in selling them, and the stock are to belong to said Robbins till the sum of two hundred and fifty-four dollars is returned, and the profits to be equally divided between the parties, and said Laswell guarantees that the portion of profits coming to said Robbins shall not be less than twenty per cent. per annum on the above sum.

" Witness our hands and seals, the day and date first above.

SILAS W. ROBBINS. [SEAL.]
THOMAS LASWELL. [SEAL.]"

On the back of said agreement was an indorsement as follows :

" The within agreement shall include the purchase of eleven head of yearlings, and five head of two year old bought at the sale of Ira C. Ash, made on the 29th day of April, 1853, and in payment the undersigned have executed their joint note to Antrim Campbell for $120.70, with six per cent. from date till paid, in twelve months from 29th April, 1853, being the date of sale, and as these cattle are bought on credit, the profits are to be equally divided.

" Witness our hands, this 30th day of April, 1853.

SILAS W. ROBBINS.
THOMAS LASWELL."

The bill was filed by said Robbins, setting forth said agreement and indorsement, and charges, that beside the sums specified therein, said Robbins advanced large sums of money upon the basis and terms specified in said agreement, between the date of said agreement and the last of February, 1856, amounting to upwards of five thousand dollars, including notes given ; that said Laswell purchased cattle, hogs and horses, with the money so advanced, and made sales from time to time, but did not render full reports to said Robbins, and defrauded said Robbins by appropriating the money to his own use, and claiming the property as his own, and not taking good care of the cattle, etc.; that Robbins had endeavored to

settle, but Laswell refused to do so, and declared his intention to keep money and property.

Interrogatories were propounded to said Laswell; an injunction and receiver, and a final settlement, were prayed for.

A receiver was appointed by the court, who reported that said Laswell refused to deliver the property to him.

The answer of Laswell admits the making of the agreement and indorsement thereon, but that they were intended to cover an usurious transaction, and denies that he is liable to account to said Robbins for money, cattle, hogs or horses in his possession, and refused to answer interrogatories.

Replication was filed, depositions taken, and at the November term, 1857, the cause was referred to the master in chancery to take testimony, state the accounts, and report.

The master afterwards filed his report to the court, and statement of accounts, by which it appeared that Laswell was indebted to Robbins in the sum of $1,902.41, not including a large number of cattle, hogs and horses which Laswell had in his possession when the suit was brought, he having excluded the horses from his account, and having reported that he had no means of ascertaining the value of the hogs and cattle in Laswell's possession. Said Robbins excepted to the report of master, which was overruled, and exceptions taken to decision; and afterwards, at the special February term, 1860, a final decree was rendered in favor of complainant for $411.83, to which complainant excepted, because the decree should have been for a larger sum, according to the evidence in the case.

J. C. CONKLIN, for Plaintiff in Error.

STUART, EDWARDS & BROWN, for Defendant in Error.

BREESE, J. The only or principal question of law presented by this record, arises out of the following agreement and indorsement thereon:

"Memorandum of an agreement, made this 1st day of March, 1853, between Silas W. Robbins, of the first part, and Thomas Laswell, of the second part: Witnesseth, that the said Robbins, party of the first part, has this day advanced to said Laswell, party of the second part, two hundred and fifty-four dollars, to buy young cattle, heifers, steers, yearlings, etc., with, and said Laswell is to feed, salt, handle and manage said stock well, in every respect, and to have proper oversight and care in regard to said stock during the next grass season, and if not sold in the fall for small beeves or otherwise, said Laswell is to winter well the next winter, and have

them in good order to go on the grass of the spring of 1854, and said Laswell is to sell them all in one year from this date, if deemed practicable, and is to be at all expense and trouble in feeding and salting said stock, supposed to be about forty head, and in selling them, and the stock are to belong to said Robbins till the above sum of two hundred and fifty-four dollars is returned, and the profits to be equally divided between the parties, and said Laswell guarantees, that the portion of profits coming to said Robbins shall not be less than 20 per cent. per annum on the above sum.

"Witness our hands and seals, the day and date first above.

SILAS W. ROBBINS. [SEAL.]
THOMAS LASWELL. [SEAL.] "

On the back of said agreement was an indorsement as follows:

"The within agreement shall include the purchase of eleven head of yearlings, and five head of two year old bought at the sale of Ira C. Ash, made on the 29th day of April, 1853, and in payment, the undersigned have executed their joint note to Antrim Campbell for $120.70, with six per cent. from date till paid, in twelve months from 29th April, 1853, being the date of sale, and as these cattle are bought on credit, the profits are to be equally divided.

"Witness our hands, this 30th day of April, 1853.

SILAS W. ROBBINS.
THOMAS LASWELL."

Does this agreement constitute a partnership, and was it extended by the mutual understanding of the parties, and for what time? The theory of the plaintiff in error is, that this agreement, made the parties to it, partners not in the stock purchased, but in the profits arising from its sale, and that although limited by its terms to one year, and embracing only the stock to be bought with the money therein specified, yet it was continued, by the mutual understanding and tacit agreement of the parties, to three years, and by the same understanding, was included all stock purchased within that time, and for which the defendant in error ought to account. It will be seen, by the indorsement on the agreement, the stock bought of Ash in April was, in express terms, made subject to this agreement, and it is to be determined, by the testimony in the cause, whether the stock subsequently purchased was to be embraced within it.

But first, as to the question of a partnership and its extension. The defendant in error contends, that such a relation has not been established by any certain proof—that the testimony to that point is too loose, uncertain and unsatisfactory

Robbins *v.* Laswell.

to convince the mind of its existence, and that the plaintiff, holding the affirmative, should make it appear by clear and satisfactory evidence. He further urges, that if a partnership really existed, as to the stock purchased under the agreement of March, and which was made to include the stock subsequently purchased of Ash by a special indorsement thereon, that the conduct of the plaintiff in error, in his dealings with the defendant, is inconsistent with the theory that this contract was extended and enlarged by a parol understanding of the parties, so as to include all stock purchased during the three years, in which the parties transacted the business of buying and selling this kind of stock. He cites the fact, that the Ash cattle, by special indorsement on the agreement, were made to be included in it, and asks the question, how it was, that the greater interests which accrued subsequently, by large purchases of stock, were not manifested by some writing between the parties, and he concludes, from this fact, that there was no parol extension of the written contract of March.

We cannot say what may have influenced the parties, to have observed less caution as their business increased, but we do not suppose it was obligatory on them to put their mutual understanding in writing, if they deemed themselves able to show, by facts and circumstances, which speak louder than words, that their conduct could not be reasonably referred to anything else but the written contract. It may be, a mutual confidence had been inspired, and so strong as to render unnecessary the usual safeguards and strictness with which business of this nature is commonly surrounded. A fact is referred to by the defendant in error, as conclusive, in his judgment, that no partnership existed in the stock acquired after the date of the first contract, and that is, that at an arbitration in the spring of 1856, between these parties, the plaintiff in error was sworn as a witness, and then testified that he and the defendant were not, and had never been, in partnership "in a hoof of stock."

This does not, in our judgment, militate against the theory of the bill. The plaintiff does not allege a partnership in the stock purchased. That he claims as his own, and for which he is to be reimbursed. He claims only, that the defendant was a partner with him in the profits to be realized from the sale of this stock, and which, by the agreement, could in no event be less to the plaintiff than twenty per cent. per annum on the money advanced by him.

Now, the question properly arises here, does this agreement make a partnership? As between themselves, we think there can be no doubt. It seems to be well settled, that

when, by agreement, persons have a joint interest of the same nature in a particular adventure, they are partners *inter se*, although some may contribute money, and others labor. As in the case of *Reid* v. *Hollinshead*, 4 Barn. & Cress. 878, where Abbot, Ch. J., said "such a partnership may well exist, although the whole price is, in the first instance, advanced by one party, the other contributing his time and skill and security in the selection and purchase of the commodities." If, then, parties agree to share the profits, they are partners in the profits, although one contributes the capital or goods, and the other only trouble. Such is the case made by this record. The plaintiff in error furnished the stock by his capital employed in its purchase, and the defendant his time and trouble in preparing it for market, and making sales. It is not necessary that the parties should agree to share in the losses. Story on Part., Sec. 15; *Dob* v. *Halsey*, 16 Johns. 34; *Ferguson* v. *Alcorn*, 1 B. Monroe, 160.

These parties were partners in the profits of the first adventure, as specified in the written agreement. Was that agreement extended and enlarged, so as to embrace the stock purchased subsequently, and up to the fall of 1855?

We have examined all the testimony in the cause with great care, and it establishes, with sufficient clearness, that all the stock purchased, whether of cattle, hogs or horses, was to be controlled by the written agreement of March. This was the tacit understanding of the parties, since it is not shown by any act of theirs, or by any declaration of either party, that they had terminated, or desired to put an end to the written agreement of March, at the end of the year, the defendant admitting, on several occasions, that the plaintiff furnished the money, and when he was reimbursed his advances, the profits were to be equally divided between them. To what else, but to this written agreement, can the acts and conduct of these parties to be referred, no new or different agreement being set up or shown, and no extension in writing being necessary?

If a person leases a house for one year at a stipulated rent, and holds over another year, he will be adjudged to hold under the terms of the agreement for the first year, nothing to the contrary being shown. It is not at all probable, that the defendant would draw, and the plaintiff accept and pay orders for stock for three years, and to the amount of near four thousand dollars, unless it was the tacit understanding of these parties, that all these transactions were under the agreement of March, and to be controlled by it.

The defendant contends, however, even if the subsequent

purchases of stock were included in this agreement, that they have been settled and adjusted, and an exhibit marked C is relied on to sustain this view.

This paper is proved to be in the handwriting of the plaintiff, and was produced by the defendant on the hearing, and is claimed by him, as the account rendered by the plaintiff against him, and as containing a full statement of their transactions growing out of their agreement. The paper bears no date, nor is it shown it was made out by the plaintiff for any purpose of a settlement, or delivered by him to the defendant. Being in the handwriting of the plaintiff, it is evidence against him, as a memorandum at least, but subject to explanations. We have examined this exhibit, and do not understand that it purports to be an account stated, or anything of the kind. It appears to be a rough memorandum made by the plaintiff, perhaps with a view to a future settlement, and was probably made in the spring of 1856, after their difficulties had arisen. It contains a statement to the effect that the defendant had received of the proceeds of the " California sale " the sum of fifteen hundred and four dollars and one cent, and the plaintiff had received, of the same proceeds, four thousand and fourteen dollars. This certainly is not an account of their whole business, but of one sale only, and can charge the parties only so far as it goes. In it, a mistake against the plaintiff, of a large sum, is clearly shown by the testimony. In this memorandum, he is charged with having received, on the sale of cattle to one Huber, the sum of nineteen hundred and ninety dollars, whereas, he received but one thousand dollars of that sum, the remaining nine hundred and ninety dollars having been credited to the defendant and appropriated by him. The paper does not purport to be an accounting as to all the business of buying and selling stock, in which these parties were interested, nor does it afford any satisfactory evidence of the true state of the accounts. Taking it for what it proves, it would show, that out of the proceeds of a certain sale of stock, the plaintiff had received a certain sum of money, and the defendant a certain other sum. The stock remaining on hand, and the profits on the sales do not appear.

The evidence is quite convincing, that from the 1st of March, 1853, up to the spring of 1856, when the parties had a misunderstanding, the defendant was in the constant practice of purchasing cattle, hogs and horses, and drawing bills for their price on the plaintiff, or placing his name to notes executed for the price, all which were promptly paid by the plaintiff, and claiming that he was entitled to one-half the

profits. The whole amount thus paid by him, including the first advance in March, 1853, reaches to about the sum of three thousand dollars, as appears from the testimony of the numerous witnesses whose depositions are in the record. But it is contended by the defendant, that no claim that hogs or horses purchased by the plaintiff, and received by the defendant, can be considered as within this written agreement, inasmuch as that specifies young cattle only.

The proof shows that the hogs and horses were paid for by Robbins, in the same mode that he paid for the cattle, and the defendant himself, in exhibit (C) which he introduced as evidence, has claimed for, and been allowed his share of the proceeds of the sale of hogs. No new contract having been set up, as to the hogs and horses purchased, and the defendant claiming and receiving a credit for his share of the sale of hogs, and there being nothing shown but the written contract of March, 1853, to which to refer these transactions, we must, to effectuate justice, refer them all to this contract, as their real basis. The claim of the plaintiff to be reimbursed for them, and for his equal share of the profits arising out of their sale, if sold, would seem to be quite as meritorious and well grounded, as his claim to be reimbursed for the cattle, and to be paid his share of the profits on them. No other basis but that contract has been exhibited. The claim of the defendant, that all their dealings were adjusted and settled in exhibit (C), does not seem to be well sustained, as no full account of purchases or of sales is therein exhibited, and no accounting, as to the stock then on hand, or as to the horses.

The evidence shows a considerable amount of property belonging to the plaintiff, in the possession of the defendant, and which he refused to deliver up to the receiver appointed by the Circuit Court, on filing this bill of complaint. He now asks, on what principle is it that the court can decree that defendant should pay a specific sum to the plaintiff in money, if there be such property in his hands, and why not rather decree a division of the property, or pass an order for its sale and divide the proceeds? The answer to this, we think, is quite obvious. A division of the property, the whole of it being the property of the plaintiff, or of its proceeds on a sale, would not be just to the plaintiff. It would be giving the defendant that to which he is not entitled by the terms of the agreement. The stock undisposed of, is the property of the plaintiff, and if the defendant has neglected to sell it, so that profits might be had, to one equal half of which he would be entitled, and has refused to place it in the custody of the court, and has, as the proof shows, butchered and sold, and given

away to his relations, a considerable portion, the strongest considerations of equity would prompt the court to decree against him, the value of such property as he has wrongfully endeavored to appropriate to his own use.

We think the theory of the plaintiff in his bill is sufficiently established by the evidence in the cause—that he bought the stock of cattle, hogs and horses, which was his own property, and was to be reimbursed its value or cost, and such profits as might be made on the sale of it, were to be equally divided between the parties. This is established with reasonable certainty, and there is nothing, we can discover, in the conduct of the plaintiff, and in the dealings of the parties, inconsistent therewith. This court having jurisdiction, a partnership existing as to the profits, will hold the case and so adjudicate upon it as to do complete justice between the parties. To that end, it is decreed that the plaintiff be reimbursed the full amount of his advances for cattle, hogs and horses, from March 1, 1853, to the end of February, 1856, and which came into the possession of the defendant by delivery or otherwise. That the plaintiff also have and receive of the defendant, one equal part of the profits, which may have been derived from the sale of all or any part of said property, and that the testimony taken in this cause be referred to the master in chancery of the Sangamon Circuit Court, who shall therefrom make up a report, showing, first, the whole cost of the cattle, hogs and horses purchased by the plaintiff, and which came to the possession of the defendant prior to March 1, 1856, under the agreement of March 1, 1853, and extended and enlarged by the parol assent of the parties to the time first mentioned; showing, second, the amount of profits derived on the sale of any portion of said property, giving to the plaintiff one equal half part thereof, and to the defendant the other equal half part thereof; and third, to ascertain the value of the property so purchased by the plaintiff which was in the possession or control of the defendant, at the time of filing this bill, and which he refused to deliver up to the receiver appointed by the Circuit Court, and which inquiry will include the hogs, horses and other like property the said defendant may have disposed of to others without accounting for the same to the plaintiff; and for which sums, when ascertained, a decree shall pass in favor of the plaintiff, together with the costs of this suit.

We have not deemed it necessary to make any remarks upon the claim set up by the defendant, that a portion of this stock was purchased with a view to stocking the "Claywell farm," as it is called, inasmuch as all the testimony goes to

show, that agreement was never consummated by the intended parties to it. That agreement having failed, the stock could not be retained by the defendant on that pretext, and he is bound to account to the plaintiff for them as his original property.

The decree of the Circuit Court is reversed, and the cause remanded, with instructions to the Circuit Court to proceed in the cause in conformity to this opinion.

*Decree reversed.*