## WEEKS v. McCLINTOCK.

PARTNERSHIP: *Stipulation in contract of partnership waived by conduct of partner.*

By the terms of a parol contract under which the plaintiff and defendant became partners, the plaintiff was to manage the business of the firm and give it his undivided attention, and was to receive for his services $100 a month. The evidence showed that the plaintiff did not give the business his undivided attention, but was often and a large portion of his time absent, leaving the business in charge of others. The partnership lasted over two years, and during all that time the defendant was doing business within five hundred feet of the place where the partnership business was conducted, and knew of plaintiff's absence and manner of attending to the business, but made no complaint. In an action for a settlement of accounts, *held:* That the stipulation in the partnership agreement which required the plaintiff's undivided attention to the business, was waived by the defendant's acquiesence in the manner of conducting it, and that the plaintiff was entitled to $100 a month for the time he had charge of the business.

APPEAL from *Prairie* Circuit Court in chancery
M. T. SANDERS, Judge.

*George H. Sanders,* for appellant.

By the terms of the partnership agreement McClintock was to give his "entire and undivided attention and time to the business." Having failed to do so, he was not entitled to the $100 per month salary for his services. Aside from his contract, the law imposed the obligation upon

McClintock of devoting his entire time and best attention to this business, especially when he was paid a salary for so doing. If the business enterprise was a failure through his fault and neglect, he not only forfeited his salary, but was responsible for all losses which the other partners sustained. *Pars. on Part.* \*pp. 223-4; 10 *Wall.*, 304; 2 *Wall.*, 70; 69 *Penn. St.*, 30; 34 *Mo.*, 524.

Having exclusive custody of all the business and the capital stock, he should have been charged with the whole amount, with reasonable profits, and then be forced to account for all, with such deductions as he could show were unavoidable losses. 10 *Wall.*, 306; 2 *Id.*, 70; 104 *Mass.*, 436; 10 *Ohio*, 351.

2. The master erred in rejecting the Blanchard & Brooks accounts. The evidence shows that McClintock became liable for them.

*J. E. Gatewood,* for appellee.

The evidence shows that McClintock carried out the contract as he understood it, and that he substantially complied with it. Week's conduct in permitting the business to be run during the entire partneaship, raised the presumption that he acquiesced in McClintock's view of the matter, and estops him from denying that the services were rendered. 1 *Greenl. Ev., sec.* 197; *Ib., sec.* 22; 9 *Atlantic Rep.*, 364. By acquiescing in McClintock's management so long, Weeks has estopped himself from setting up a non-compliance on the part of McC. with the terms of the contract. 28 *Fed. Rep.*, 169; 21 *S. C.*, 126; 5 *Am. Rep.*, 526; *Collyer on Part., sec.* 210, *Perkins' Ed.*

2. The evidence fails to establish McClintock's liability for the Blanchard & Brooks account. Even if McClintock agreed to pay them, it would not be binding for

want of consideration; and being a mere collateral un-
dertaking, void. 12 *Ark.*, 174; 31 *Id.*, 613; 31 *Am. Rep.*;
476.

BATTLE, J. In the latter part of May, 1881, Weeks &
Co. and J. M. McClintock entered into a partnership to
manufacture spokes and gin and bale cotton. Their firm
name and style was J. M. McClintock & Co., and their
place of business, Fredonia, in Prairie county, Arkansas.
By the terms of their contract, which was in parol, they were
to be equal partners, and McClintock was to manage and
superintend the business and give it his undivided attention,
and to receive for his services one hundred dollars a month.
In June, 1881, he took charge of the machinery of the firm
and commenced business. In a few months the new firm
enlarged its business by adding new machinery of the value
of $3,000, and operating a saw mill and shingle machine.
In November, 1883, it sold a part of the machinery to Weeks
& Co. and ceased to do business, and turned over the ma-
chinery remaining unsold, and the grounds and buildings
belonging to it, to Weeks & Co.

McClintock and Weeks failing to agree upon a settlement
of their partnership affairs, and Weeks refusing to arbitrate
them, McClintock filed his complaint in equity in the Prairie
circuit court, asking for an accounting, a settlement of ac-
counts, and a dissolution of the partnership. Weeks an-
swered; and by consent of both parties the cause was re-
ferred to the clerk of the court as master to take proof and
state an account, which he did, allowing to McClintock the
sum of one hundred dollars a month for twenty-eight months
for superintending the business of McClintock & Co., and
refusing to allow Weeks & Co. $419.19, the amount of the
account of Blanchard and Brooks with Weeks & Co., which
Weeks alleges McClintock & Co. agreed to pay. Weeks
excepted to the account, because the master allowed the one

one hundred dollars a month for twenty-eight months, and refused to allow the $419.19, and for other reasons. The court overruled the exceptions stated, and rendered a judgment against Weeks in favor of McClintock for $660.67, the balance found to be due him, and Weeks appealed.

It is insisted that McClintock is not entitled to the one hundred dollars a month for twenty-eight months, because he failed and neglected to manage and superintend the business of McClintock & Co. as he agreed to do; but on the contrary neglected it and did not give it exceeding one-third of his time. Some of the witnesses testified that he was not present at his place of business more than one-third of his time, and that in his absence the interest and business of the firm were neglected and suffered materially, while others testified that he was not often absent, except on the business of the firm, and that the business did not suffer on account of his absence, and was not neglected. The preponderance of evidence, however, shows McClintock did not give the business his undivided attention and time as he agreed to do, but was often and a large portion of his time absent. While absent he left the business in charge of other persons. During all this time Weeks & Co. were doing business within five hundred feet of the place of business of McClintock & Co., and knew of the absence of McClintock, and how he conducted the business, and acquiesced in his mode of attending to it. Under these circumstances is he entitled to the one hundred dollars a month for the time he had charge of the business?

Judge Story says: "Partnership articles in the view of courts of equity, whatever may be the rule at law, are liable to be controlled, superseded, qualified, or waived by the acts and transactions of the partnership, in the course of the business thereof, wherever the assent of all the partners thereto may be fairly inferred, and however positive or stringent,

those provisions may be.  ('Partners,' it has been said, 'if
they please, may, in the course of the partnership, daily
come to a new arrangement for the purpose of having some
addition or alteration in the terms on which they carry on
business, provided those additions or alterations be made
with unanimous concurrence of all the partners.')   In short,
in many cases of this kind, looking to the course of conduct
of the partners, and the special circumstances of their busi-
ness, *or to their general acquiescence,* or their positive acts,
we may often have the most satisfactory evidence that the
partnership articles have been laid aside, either *pro tanto,* or
in whole, and that new articles and arrangements have been
entered into in their stead.   Hence it has been judicially de-
clared, that, in courts of equity, articles of partnership, con-
taining clauses  which have  not been  acted  upon  by the
parties, are read, as if those clauses were expunged, or were
not inserted therein."   *Story on Partnership, sec.* 192.

In *Pilling v. Pilling, De G. J. & S.,* 162, " a father took
his two sons into partnership under articles by which it was
agreed that the business should be carried on with the
father's capital, *which should remain his;* that yearly stock-
takings should be made; that the partners should share
profits and losses equally in thirds; that each of the sons,
besides his own share of the profits, should have £150 a year
*out of the father's share*; that repairs and other outgoings in
respect of the business premises should be paid out of the
profits; that before division of the profits the father should
have interest at £4 per cent. on his capital, and that in esti-
mating profits a certain discount should be taken off the
mills and machinery.   The partnership lasted ten years,
during the whole of which time in the yearly stock-takings
the mills and machinery were valued as they stood, without
any discount as provided in the articles, and without distin-
guishing the increase of value arising from additions and im-

provements, and the expenses of the additions and improvements were charged against the partnership ; the £150 a year to each son was charged *against the business,* not against the father's share of profits; each partner was credited with. interest. on the capital standing to his credit at the beginning . of the year, and the profit was then divided in thirds and the shares carried to the credit of the partners respectively." It was " held that this mode of keeping the accounts and the . division of the profits according to it evidenced a *new agreement* between the parties, and the account must be taken *on that footing, and not the footing of the articles*; and that whether the mills and machinery were, according to the articles, the property of the father or of the partnership, they must be treated as, *being, under this agreement, the property of the partnership.*"

In *Haller v. Williamowicz,* 23 *Ark.,* 566, the parties formed a partnership in the tanning business. By the articles of copartnership it was stipulated that Haller should have charge and control of the tan yard, and stock in it, and should devote all his time and attention to the business of the yard. Williamowicz interfered with the business of the yard contrary to the articles, by causing defective vats to be built, and thereby caused a loss to be sustained by the copartnership. Mr. Justice Compton, speaking for the court, said : " Conceding that Haller had, according to the written stipulation between the parties, the exclusive control of the joint business, so far as regards the process of tanning, or the preparation for it; and recognizing as we do, the soundness of the principle, that where the partnership articles provide that one partner shall exclusively manage all the affairs of the concern, or any particular department of the business, and the other partner positively violates such provision by intermeddling where he has bound himself not to intermeddle, and the copartnership thereby sustains losses or dam-

ages, they are to be borne exclusively by such intermeddling partner, still, on the principle, equally well established, that the articles of partnership, however stringent, are liable, in the view of a court of equity, to be qualified or waived, either pro tanto, or in whole, by the assent of the partners, express or implied from the acts or transactions of the partnership, the decision of the chancellor, disallowing the claim, upon the state of the case before him, was right, because it is conclusively shown by the evidence, that Haller expressly assented to the employment of a mechanic by Williamowicz, to build the vats, and that they were built under his immediate observation."

In *Hall v. Sannoner*, 44 *Ark.*, 34, an effort was made by Hall to hold Sannoner liable for losses sustained by Sannoner selling goods to insolvent purchasers, in violation of their written agreement. The agreement was as follows: "There are to be no new accounts opened or goods sold on credit to any customer after this date, except to well-known prompt paying solvent parties, and not to them except on short time, and with the knowledge and consent of both parties" to the agreement. Sannoner sold goods to insolvent persons. During the time these sales were being made, Hall was in the house daily, except during an absence of three weeks. He had constant access to the books, which showed the names of the parties credited; had examined them; and had ample opportunity to know that Sannoner was selling on credit, and to whom he was selling. He made no protest to Sannoner about the sales on credit, but always told him, when applied to about crediting any individuals, that if he knew the parties were good, to credit them. Afterwards, when they attempted to settle, Hall claimed there had been a violation of the agreement not to sell on credit without his consent, and that Sannoner was responsible for the losses sustained by the sales to insolvent persons. This court held

that he waived the agreement to the extent it was necessary to get his consent to the sales; "and that, after standing by blindly and refusing to see what his duty prompted him to know, he could not be heard to say he did not know;" and that "it was his own fault that he did not know all about the transactions as they occurred, and it must be presumed that he knew and acquiesced."

It has often been judicially declared that "partners, in equity, may be held by their conduct, to have changed the terms of a written agreement, into which they have entered for carrying on a concern, and to have substituted the terms to which they have adhered, instead of the terms contained in the original agreement." *Coush v. Harris*, 11 *Eng. Ch. Rep.*, 269; *Coventry v. Barclay*, 33 *Beav.* 1; *Same v. Same*, 3 *DeG. J. & Sm.*, 320; *England v. Curling*, 8 *Beav.* 133; *Geddes v. Wallace*, 2 *Bligh*, 270; *Jackson v. Sedgwick*, 1 *Swanst.* 460; *Robbins v. Laswell*, 27 *Ill.*, 365; *McGraw v. Pulling*, 1 *Freem. Chy. (Miss.)*, 357; *Boyd v. Mynott*, 4 *Ala. (N. S.)* 79; 2 *Lindley on Partnership, p.* 820*; *Parsons on Partnership*, 238; *Collyer on Partnership*, secs. 209, 210.

In this case the contract is in parol. For more than two years Weeks & Co. saw and knew how McClintock was managing the business of the new firm. They made no complaint to him as to his manner of managing it. He had a right to presume from their silence that they approved his course of conduct, and to continue to act upon that presumption. They accepted his services, acquiesced in his conduct, and waived their contract with him to the extent of requiring him to give their business his undivided time and attention. It is too late for them to dispute his right to his wages after they have silently accepted his services for the period of twenty-eight months.

It is not satisfactorily shown that McClintock & Co. agreed to pay the accounts made by Blanchard and Brooks

with Weeks & Co.   The other exceptions taken by appellant
to the master's report are not insisted on here.

Decree affirmed.