(No. 12964.—Reversed and remanded.)

JAMES D. HAND vs. EDWIN M. ALLEN et al. Appellants.—
(W. J. PILKEY et al. Appellees.)

*Opinion filed June 16, 1920—Rehearing denied October 6, 1920.*

1. PARTNERSHIP—*conduct of parties may 'show extension of a partnership for longer time than originally intended.* Parties who have agreed to become partners in the purchase and operation of mines in a certain territory may by agreement extend their contract to other territories and other business and for a longer time than originally contemplated or otherwise change the terms of their agreement, and such variations of the contract may be shown not only by evidence of an express agreement but by evidence of the conduct of the parties.

2. SAME—*partner or trustee cannot deal with subject of trust for his own private benefit.* It is the duty of a trustee, partner or adventurer in a common enterprise to abstain from dealing with the subject of the trust, partnership or adventure for his own private benefit during the existence of the relation, and if the partner or co-adventurer gains any profit or advantage to himself by such dealing it will inure to the equal advantage of all.

3. SAME—*stockholders of corporation are not partners because they are joint owners of stock.* A partnership implies a union of money, property, labor or skill, or some or all of them, for some purpose of commerce or business and a sharing of profits or loss, but the stockholders of a corporation, whether they own their stock jointly or severally, are not partners.

4. SAME—*joint ownership of property does not make the owners partners.* Mere tenancy in common or joint ownership of property does not make the owners partners.

5. SAME—*when release executed by partner precludes his sharing in an accounting.* Where parties enter into an agreement for the organization of a corporation to purchase and operate mining claims, one of the partners who executes a release of his option to purchase the claims and by which the corporation is to acquire the property is not entitled to any share in an action for an accounting against one of the other partners, who, after the owners of the claims have refused to go on with the transaction, ignores the previous agreement and purchases and operates the mines for his own benefit.

6. TRUSTS—*trustee cannot purchase outstanding paramount title without notice to beneficiaries.* A trustee cannot purchase an outstanding paramount title and hold it adversely to the beneficiaries

of the trust without notice to them of his resignation of the trust, and such a purchase will be held to have been made in subordination to the trust, but the trustee will be entitled to credit in his accounting for what he was compelled to pay in buying in the outstanding title.

7. CORPORATIONS—*stockholders are not necessary parties to suit against the corporation.* The stockholders of a corporation are not necessary or even proper parties to a suit against the corporation which affects them only in their character as stockholders and not as individuals, as the corporation represents the stockholders in all actions regarding the rights and obligations of the corporation.

8. ACCOUNTING—*decree for accounting may require defendants to produce books before master—costs.* A decree for an accounting may require the defendants to produce their books of account, papers and writings before the master and may require them to pay all costs to the date of the decree, but it is premature for the decree to further order that the defendants pay the expenses of the reference to the master.

APPEAL from the Circuit Court of Cook county; the Hon. MERRITT W. PINCKNEY, Judge, presiding.

DEFREES, BUCKINGHAM & EATON, (GEORGE T. BUCKINGHAM, DON KENNETH JONES, and WILFRED M. DOHERTY, of counsel,) for appellants.

MILLER, GORHAM, WALES & NOXON, for appellees.

MUSGRAVE, OPPENHEIM & LEE, for James D. Hand.

Mr. JUSTICE DUNN delivered the opinion of the court:

This is an appeal by Edwin M. Allen and the Western Ore and Mining Company from a decree of the circuit court of Cook county which awarded an accounting and other relief against the appellants in favor of James D. Hand, W. J. Pilkey and W. C. Hosking.

The bill was originally filed by Hand against Allen and the Western Ore and Mining Company for the dissolution of an alleged partnership between Hand and Allen and an accounting, but amendments were later made alleging an additional agreement between Hand and Allen on the one

hand and Pilkey and Hosking on the other for the acquisition of certain mines under options held by Hosking, by reason of which Pilkey and Hosking were entitled to certain interests. Pilkey and Hosking were made defendants to the bill as amended, which prayed that their interests, also, if any, should be ascertained and declared.

The bill as amended alleged the formation in Chicago in March, 1916, of a partnership between Hand and Allen for the acquisition and operation of ferro manganese mines in Lower California. The partnership was evidenced by a written agreement which provided that the acquisition, development and operation of the mines and the shipment of the ore should be in Hand's charge and the selling of the ore and financing of the partnership should be under Allen's control. Hand went to Lower California and began to prosecute the business of the partnership, acquired some leases and mined and shipped some ore, but in a few months he was obliged to shut down the mine because of the Mexican embargo on the exportation of manganese ore. Hand returned to Chicago and efforts were made to secure the raising of the embargo, which were unsuccessful. In the meantime, it was alleged, Hand, on behalf of the partnership and with Allen's knowledge and consent, during the spring of 1917 made careful investigation of manganese deposits in various parts of the United States and obtained numerous reports, samples and analyses of a large number of different manganese deposits in various parts of the country, all of which investigations and the information received during them he reported to Allen. Hand learned that considerable quantities of manganese ore were being shipped from the neighborhood of Phillipsburg, Montana, and that W. J. Pilkey, of Chicago, was interested in manganese property in Montana. He called upon Pilkey at his office in Chicago and was informed by Pilkey that he had a partner, Hosking, who had options on certain manganese properties in Phillipsburg, and that Pilkey and Hosking would

be willing to transfer a half interest in the properties and claims to Hand and Allen if the latter would pay the money and perform the conditions required in the options. Hand took certain samples of ore which Pilkey had shown him to Allen's office, told Allen of the information he had received and suggested that Hand should ·first investigate on behalf of the partnership and examine the field, and, if the examination should confirm the information, that the partnership should proceed to procure manganese ore from Montana instead of Lower California and that the claims or mines should be procured and handled by Hand and Allen under the articles of partnership already formed. After some hesitation, the bill alleges, Allen agreed to Hand's proposal. Thereupon Hand went to Montana, met Hosking and carefully investigated the various ore deposits and manganese properties in the vicinity of Phillipsburg. Hosking showed him an option which Hosking held for the Trout and Gem properties from Earle B. and James Patten and an extension of time thereon. Hand informed Allen that he believed a new lease could be procured from the owners of the Trout properties on better terms, and Allen requested Hand to procure from the owners, in writing, the best proposition possible. The bill then sets forth negotiations conducted by Hand and Hosking which resulted in Hosking obtaining from the John Caplice Company, the owner, a new lease and option on the Trout properties, and also the activities of Hand in examining the manganese field, investigating various properties and taking options thereon, reporting daily to Allen. Hand returned to Chicago, and on July 25, 1917, Hand and Allen met Pilkey and Hosking in Allen's office in Chicago. Allen then informed the others that William E. Corey, the president of the Midvale Steel and Ordnance Company, would finance the taking of the Trout and Gem properties under Hosking's option for a third interest and that Allen would form a corporation to take over the property under those

options, the stock to be divided one-third to Pilkey and Hosking, one-third to Hand and Allen, and one-third to Allen, trustee for Corey. All assented to this and the contract was drawn and executed accordingly. Hosking assigned the option to Allen as trustee. Hand, Allen and Hosking went to Butte, Montana, for the purpose of taking over the Trout and Gem properties under the option from the Caplice Company, but that company refused to transfer the property, alleging that the option was void because unauthorized by the directors or stockholders of the company. Thereupon Allen notified Hosking that he canceled and rescinded the contract of July 25 because the lease and option from the Caplice Company was unauthorized and void and the agreement and option from the Pattens had expired and the extension of it was without consideration and it had also expired, and the leases, options and assignments were returned to Hosking. Allen then made a new agreement with the Pattens, whereby the Trout and Gem properties were acquired on behalf of the partnership of Hand and Allen. Leases, options and contracts of purchase of other properties were acquired for the partnership. Allen afterward caused the Western Ore and Mining Company to be incorporated and the mines which had been acquired to be conveyed to it, and it has since operated the mines and extracted ore from them of great value, but Allen has refused to permit the issue of stock to Hand or to account for the profits made. The bill alleges that Hand has always believed the Hosking options were valid, and that if Allen did not in good faith attempt to exercise them, Pilkey and Hosking would be entitled to an interest in the mines, and they were therefore made defendants.·

Pilkey and Hosking answered, admitting the allegations of the bill so far as they were concerned, and claiming that Allen acquired title to the Trout and Gem properties as trustee for himself and Hand and for Pilkey and Hosking in accordance with the agreement of July 25.

The appellants filed an answer and pleas to various parts of the bill, setting up the following defenses: First, that the partnership agreement of March, 1916, for mining in Lower California was not extended to operations in Montana but was terminated on May 1, 1917; second, that the agreement of July 25, 1917, between Hand and Allen and Pilkey and Hosking was terminated and abandoned because of the invalidity of the Hosking option and the consequent failure of consideration; third, as to the Maroney property, (one of the properties alleged in the bill to be included within the partnership,) that neither of the defendants has at any time owned or operated that property; fourth, that Hand induced Allen to enter into the partnership agreement of March, 1916, by false and fraudulent representations, by reason of which that agreement is of no force in equity; fifth, as to Hosking, that he executed a release to the Pattens and their assigns of all claims arising out of the option or the assignment to Hosking. The fourth plea has not been relied upon in the argument here.

The case presents two phases which are to a great extent independent of one another. The first arises out of the written contract of partnership between Hand and Allen, which was expressly limited to Lower California as its field of operation, and the question for decision is whether the partnership thus formed was afterward extended to include the acquisition and operation of mines and mining claims in Montana. Both partners were expressly authorized to be interested in outside enterprises, though it was stipulated that neither should be interested in the mining of ferro manganese in Lower California without the consent of the other. The agreement contemplated the formation of a corporation to be known as the Pacific Ore Company to take over the partnership property and business if the result justified it, and it was stipulated that the stock interests of the partners in such corporation should be equal. The business of the partnership in Lower Cali-

fornia resulted in a loss of about $11,000 when the mining operations were abandoned. Hand could base no rights in the purchase and operation of mines in Montana upon this agreement by itself, but he and Allen could by agreement extend their contract to other countries and other business and for a longer time than originally contemplated, or change its terms, as they might deem advisable, and such variations of the contract, if made, may be shown not only by evidence of an express agreement but by evidence of the conduct of the parties. *Robbins* v. *Laswell, 27* Ill. 365.

The appellants contend that the partnership between Hand and Allen was terminated by a letter which Allen wrote to Hand on May 1, 1917, in which he said: "Following my letter of April 23, and not having heard from you in connection with closing up the accounts as well as our ore manganese business of Lower California, I beg to advise you that I am not going to put up another dollar and would appreciate your winding the affairs up by arranging to settle your account with the writer. I have determined not to be used any longer and do not like your business methods, or, rather, lack of same, and you have certainly demonstrated the fact that you are very willing to take a great many chances with someone's else money. Regarding this partnership, I went into same with the best of faith and expect you to pay me what you owe me personally, as well as your half of our losses in connection with this Lower California deal. I am not going to finance anything further, and you can cease your investigations for manganese ore as far as I am concerned, although I hope that you can feel the responsibility of your position enough to try and close the deal for the sale of our Mexican properties so that we can at least come out whole." Allen testified that after this letter he considered the partnership doing business as the Pacific Ore Company terminated. However, on May 17 he telegraphed to Hand from New York: "Wire me immediately here, Hotel Plaza, how

many tons per month you could get out if sufficient money and steamer was furnished; could you get out five thousand tons per month?" Thereupon Hand came to Chicago and had a conversation with Allen in regard to the subject of this telegram and wrote him a letter containing suggestions as to the requirements for getting out five thousand tons a month. The first requirement was the raising of the embargo, and both Hand and Allen went to Washington separately and visited the Mexican embassy to endeavor to get the embargo raised, but nothing was accomplished. These communications and actions consist with the continuance but not with the termination of the partnership.

In June, Hand became acquainted with Lindsay W. Pilkey, the son of W. J. Pilkey, who later brought his father to Allen's office. W. J. Pilkey's partner had obtained an option on May 23 from Earle B. Patten and James Patten for the purchase of a lease and option which the Pattens had on the Trout and Gem mining claims. This option had expired by its terms on June 15, 1917, but on June 18 the Pattens had given Hosking a written extension until certain terms could be obtained from the owners of the mines, which it was stated would probably be in the neighborhood of two weeks. On July 7 Hosking telegraphed Pilkey that he had got the lease extended ten days. Pilkey took the telegram to Allen's office and had an interview with Hand and Allen. It was agreed there that Hand should go to Phillipsburg and investigate the property and Hosking's option. Hand and Allen afterward discussed alone the trip to Montana and Hand's course there. They flatly contradict one another as to what was said. Hand testified Allen said if there were other properties than those Pilkey had recommended Hand and Allen would take them, if good, in the name of the Pacific Ore Company and operate them under their former agreement, while Allen denied this and said that he told Hand that Hand must not do anything until Allen passed on it, and if he got out there and found there

were good things aside from the property included in the
Pilkey proposition he must take it out in Allen's name.
Pilkey told Allen that he would go to his office and write
a letter of introduction for Hand to Hosking. He did so
and took the letter to Allen, who said there would have to
be some changes in it. Pilkey proposed to write another
letter if Allen would tell him what he wanted, but Allen
said he would change the letter as he wanted it. Pilkey
left the letter with Allen. The first two sentences of the
letter were: "This will introduce to you Mr. Hand, of
Chicago, Illinois, who is associated with Mr. Allen, also of
Chicago, and whom I have written you about on a previous
occasion. These people have connections with Mr. Corey,
of the Midvale Steel Corporation." Allen interlined in the
first sentence his initials and Hand's, and after "Allen, also
of Chicago," the words "of the Pacific Ore Company." He
struck out of the second sentence the words, "Mr. Corey,
of the Midvale Steel Corporation," and interlined instead,
"the big New York man I wrote you about." He also struck
out the words, "also show Mr. Hand any other manganese
properties you may have in sight." Allen gave Hand the
letter saying he had better have Pilkey re-write it, but when
Hand went to Pilkey's office it was locked, and he took the
letter to Hosking with the changes as Allen had made them.
By this letter Allen introduced Hand as a member of the
Pacific Ore Company and indicated very clearly his inten-
tion to continue their relation as members of that com-
pany and not to terminate it. The erasure of the request
to show Hand other manganese properties also supports
Hand's claim that Allen said in their private conversation
that if there were other properties Hand and Allen would
take them, if good, in the name of the Pacific Ore Company
and would not let Pilkey or Hosking share one-half in any
other properties they might buy. Although Allen denies
telling Hand to take leases in the name of the Pacific Ore
Company, yet Hand went to Montana, and, aside from the

negotiations in connection with the Trout and Gem prop-- erties, took in the name of the Pacific Ore Company a number of leases, which he reported to Allen. In regard to these leases and the property involved in them there was correspondence between Allen and Hand and negotiations in which both participated, all tending to show the joint interest of the two in those leases and properties. In December, 1917, Allen received a letter from E. J. Young, of Los Angeles, asking for Hand's address, beginning with the statement: "A few weeks since a relative of Mr. Hand's was in my office and gave me the information that you and Mr. Hand had gone in partners on a mining deal and had made over half a million dollars profit. I certainly hope that it is true. I wish you would let me know the facts in the matter." In acknowledging the receipt of this letter Allen wrote: "Regarding the rumor that you heard concerning the large amount of money Mr. Hand and the writer had made on a mining proposition, I only wish that same was true, which incidentally is far from being true, for I shall be satisfied if we make up the large amount of money that we lost on the Lower California situation." The inference of the partnership is plain though the large profit is denied.

While Hand and Allen contradict one another throughout their testimony in many important particulars, the corroborating evidence, when there is any, usually supports Hand. If Hand's testimony is believed, there is ample evidence to sustain the finding that the partnership was extended to include the Montana transactions, and other evidence, oral and documentary, tends to support this evidence. The chancellor had the advantage of hearing both Hand and Allen testify, and we cannot say from a consideration of all the evidence that the finding that the business of the co-partnership of Hand and Allen, doing business under the name of the Pacific Ore Company, should be extended to and include the operation of any claims or mines which

might be procured on behalf of the partnership and which the partnership might decide could be operated with profit, was manifestly contrary to the weight of the evidence. On the contrary, we regard it a fair deduction from the evidence.

The second phase of the case concerns the Trout and Gem claims, only, and begins with the introduction of Hosking and Pilkey to Hand and Allen. The Trout property was owned by the John Caplice Company of Montana, and the Gem by Shelby Irvine, Annie Williams and Fannie Russell. On May 24, 1916, the Caplice Company leased the Trout property to Earle B. Patten and James Patten for two years, with an option to purchase during that period for $150,000. On February 21, 1917, the owners of the Gem property leased it for fifteen months from March 1, 1917, to Earle B. Patten and James Patten, with an option to purchase during the term for $7700. On May 23, 1917, the Pattens gave an option on both these leases and options to W. C. Hosking, at the price of $150,000 for the Trout property at the end of two years and $10,000 for the Gem at the end of one year, the option to expire June 15, 1917, unless Hosking raised $5000 before that time for the commencement of work on the claims. On June 18 the Pattens extended this option by a writing reciting the giving of the option, and stating that "said option having expired without our having obtained complete terms from the owners of said mining claims, [we] hereby extend said option until such terms are obtained, which will probably be in the neighborhood of two weeks." The option in the lease to the Pattens of the Trout claim expired on May 24, 1918, while in the Patten option to Hosking it extended to May 23, 1919, and the terms mentioned in the Patten extension referred to an extension by the Caplice Company, the owner, to correspond with the time in the Patten option to Hosking. Hosking testified that Earle Patten told him to take up with the Caplice Company the subject of the extension of the time in the Patten option to correspond

with the option Hosking had from the Pattens. Accordingly Hosking did so, and the result was that on July 7 the Caplice Company agreed to extend the option to conform to the Patten option to Hosking, though they would not execute any papers then but would give Hosking ten days in which to get his men to furnish the $5000 for the commencement of work on the claims. Thereupon Hosking telegraphed Pilkey that he had got a ten days' extension and for him to send a man out quick. Pilkey got this telegram on Sunday, July 8, and the next day took it to Allen's office, where Hand was also. Pilkey wanted somebody sent out to investigate immediately. To Allen's inquiry how soon he could get ready to go, Hand answered that he could go right away, and on July 9 he did go to Montana to investigate the Trout claim and Hosking's option. He arrived at Butte on Thursday, July 12, and that evening met Hosking and arranged to go to Phillipsburg, about sixty miles away, the next day in Hosking's car. They went there and Hand examined the Trout and Gem claims and other properties, the district covering about a mile square. They returned to Butte, and Hand telegraphed to Allen that the district was the best he ever saw, giving some details and advising Allen to come out and see. The next morning Hosking called on Heslet, the president of the Caplice Company, and told him that Hosking's party had arrived, looked over the property and was much impressed, but the terms were short and he would like an extension of another year on the payment. Heslet told him to propose the terms of $5000 down, $50,000 in one year, $50,000 in two years and $45,000 in three years. Hosking reported to Hand, who telegraphed to Allen that Hosking believed a new lease could be obtained on better terms, to which Allen replied telling Hand to get, with Hosking, from the owners personally, their best proposition and terms in written form in duplicate and bring it to Chicago as soon as possible. Hand returned with Hosking to Phillipsburg, where they re-

mained several days, investigating the field, examining mining claims and securing options. They returned to Butte on July 18 and the next morning went together to the bank, where Hosking introduced Hand to Heslet as one of the Chicago parties who had been looking over the Trout properties and wanted to talk with him in person. Hand told Heslet that he could not recommend taking the Trout at $150,000 but would recommend $125,000 on the terms which he stated. Heslet asked Hosking if he would waive the $25,000 commission which Heslet was to pay Hosking, saying it would mean the same thing in dollars and cents to the company. Hosking said he would waive the commission, and Heslet said it was all right; he would go and see Johnson. Johnson and Heslet were two of the three directors of the Caplice Company. Heslet came back and said he had talked it over with Johnson and they had agreed to do what Hand proposed and would have the matter fixed up that afternoon. The payments were to be, $5000 in twenty days, $25,000 in one year, $25,000 in two years, $35,000 in three years and $35,000 in four years. When Hosking got the lease in the afternoon and brought it to Hand the latter made two objections to it. First, it was not signed by the secretary and the seal of the company was not attached; and second, the Pattens had made the claim that their option to Hosking had expired, and Hand had told Heslet that fact and said he wanted the company to take care of that and have all straight with the Pattens. Heslet had said he would take care of that all right but the lease said nothing about it. Accordingly Hand and Hosking went back to Heslet. Heslet said the secretary was out of town but Heslet would have him sign the lease and attach the seal as soon as he came back. So far as the Pattens were concerned, Heslet wrote and signed a statement at the end of the lease that upon payment of the first $5000 he would arrange to dispose of the Patten lease and turn the property over, clear. That night Hand

left Butte with the lease, arriving in Chicago two days later, meeting Allen there. On Sunday night they went together to Pittsburg and made arrangements there for financing the scheme through H. F. Black, who was assistant to the president of the Midvale Steel and Ordnance Company, of which W. E. Corey was the president, with whom Allen had previously been in communication about taking an interest in this property. Hand and Allen arrived in Chicago on their return Tuesday morning, July 24. Hosking had come to Chicago, and on July 25 he and Pilkey, with Hand and Allen, entered into a written agreement which is the basis of Hosking and Pilkey's case. After reciting that Hosking, on behalf of himself and Pilkey, had an option from the John Caplice Company on the Trout properties and an option from the Pattens on the Gem mining claim and had assigned both options to Edwin M. Allen, trustee, the agreement states that "it is understood that a company is to be formed by Edwin M. Allen, trustee, embracing all of the above claims, and stock of said company is to be divided as follows: One-third of capital stock to Messrs. Pilkey and Hosking; one-third of capital stock to Messrs. Allen and Hand; one-third of capital stock to Edwin M. Allen, trustee." The options were at the same time assigned and delivered to Allen as trustee by Hosking. Hand and Hosking left Chicago the next day for Phillipsburg.

By the assignment of the options and the execution of the agreement of July 25 Hand and Allen and Hosking and Pilkey became associates in the acquisition of the property involved and Allen became a trustee for all the shares in the enterprise equally. There can be no doubt about his obligation of loyalty to the common cause and his duty to act for the interest of all with perfect fairness and to avoid acquiring any interest which might conflict with the interests of his associates. He went to Montana for the purpose of completing the transaction, exercising the option and acquiring the property, arriving at Butte on August 3. The

first payment on the Caplice Company's option was due Au-
gust 8.   On Saturday, August 4, Heslet met Hand, Allen
and Hosking and it was agreed that they should meet to
conclude the matter on Monday.   There was no suggestion
then by Heslet that the agreement would not be carried
out, but when Allen called at the bank on Monday, Hes-
let informed him that the Caplice Company refused to go
on with the transaction.   Heslet claimed that Hosking had
procured the option from the company by misrepresenta-
tion; that his option from the Pattens had expired and that
the Pattens refused to give up their option, and therefore
the company could not go through with the agreement.
Allen tendered performance to Heslet on August 8, but
Heslet refused to accept payment, declined performance by
the company and served upon both Allen and Hosking no-
tice that the lease and option of the Caplice Company was
not authorized by the board of directors or stockholders of
the company and the president was not authorized to exe-
cute it, and that the directors expressly repudiated and re-
fused to be bound by it.   Thereupon Allen served upon
Hosking notice of cancellation of the agreement of July 25
because the lease and option of the Caplice Company were
void because not authorized by the board of directors, and
the option given by the Pattens on their lease from the
Caplice Company had expired and the extension thereof was
void because given without consideration and had also ex-
pired.   Negotiations by Allen with Heslet and the Pattens
were continuous throughout the week of August 5, and on
Saturday, August 11, culminated in a written proposition
by the Pattens for the assignment of their original leases
and options to Allen upon his undertaking to abide by and
perform their respective conditions and to pay to the Pat-
tens five dollars for each ton of ore extracted and shipped
up to 10,000 tons, and if that quantity should not have been
extracted and shipped by May 31, 1918, to pay for the de-
ficiency five dollars a ton.   Allen took this document with

294 – 4

him to Chicago, where he executed it on August 25. On May 13, 1918, the Caplice Company conveyed the Trout property to the Western Ore and Mining Company for $150,000. On March 19, 1918, the Gem property was conveyed to Allen, who conveyed it to the Western Ore and Mining Company on April 8, 1918. The negotiation with Heslet and the Pattens was all conducted by Allen without the participation of Hand or Hosking, and all the information they had in regard to it was such as they derived from Allen's statements to them.

The Pattens' claim that Hosking's option as extended had expired is based on these facts: On June 15 Hosking went from Helena to Phillipsburg with a man named Eichelberger to carry out this lease and option but found that Earle Patten had gone to Butte. He told Patten over the telephone that he was there to fulfill his agreement and asked if Patten would be down, that being the last day. Patten told him he could not come but would extend the option until he did come and then give him an extension. Patten had agreed to get an extension of a year from the Caplice Company when he gave Hosking the option but had not done so. · He came to Phillipsburg on June 18. Eichelberger wanted the option Patten had given to Hosking and the one he had received from the Caplice Company to correspond, and when they were made to agree he was ready to furnish the $5000. The extension was signed that day. Patten afterward claimed that the extension was given only for the benefit of Eichelberger and that Hosking had no right to turn the option to any other person, and on July 2 he told Hosking that he would call it all off and have nothing more to do with Hosking. Afterward Allen got the advice of a lawyer that the extension was void for want of consideration and for indefiniteness as to time.

The reason given for the invalidity of the Caplice Company's option has been stated. The directors were Heslet, who was the assistant cashier of the bank; Johnson, who

was also an employee of the bank; and a young lawyer who had one share of the stock. Heslet and Johnson had consulted and agreed that Heslet should execute the lease and option, but no record was made of it. Neither could any record be found of any authorization of the Patten lease. Allen procured the opinion of an attorney, also, that Hosking's lease was unenforcible on this ground. Neither Hosking nor Hand was present at any of the interviews which Allen had with the attorney whom Allen procured to advise all of them or with Heslet or the Pattens.

The good faith of Allen's efforts to secure the performance of the option agreements or the settlement of the difficulties which intervened is seriously questioned. We do not deem it necessary to follow the devious course of the testimony through all the pages of the voluminous record. The duty of a trustee, partner or adventurer in a common enterprise to abstain from dealing with the subject of the trust, partnership or adventure during the existence of the relation, for his own private benefit, is clearly fixed by the law, and it is clearly established that a trustee, partner or co-adventurer cannot gain any profit or advantage to himself by such dealing but it will inure to the equal advantage of all. Allen could not acquire an interest in the mining claims which constituted the subject matter of the contract of July 25 so long as that contract existed. By the assignment of the options to him he became a trustee for all the parties to the contract, and all those parties were entitled to the benefit of any contract he might make in regard to those mining claims, subject to the liability to contribute ratably to the cost. A trustee cannot purchase an outstanding paramount title and hold it adversely to the beneficiaries of the trust. Such a purchase will be held to have been made in subordination to the trust, though the trustee will be entitled to credit in his accounting for what he was compelled to pay in buying in the outstanding title. (*Cushman* v. *Bonfield,* 139 Ill. 219.) A trustee to pur-

chase a railroad for the bondholders under a re-organization scheme may abandon the purchase if the bondholders fail to furnish the money to pay the purchase price but if he completes the purchase he is bound by the terms of the trust. (*Indiana, Illinois and Iowa Railroad Co.* v. *Swannell,* 157 Ill. 616.) If the validity of Heslet's objection and of the Pattens' contention and the correctness of the attorney's opinions be conceded, then Allen, upon discovering such facts, would have been justified in abandoning the enterprise and assigning the options back to Hosking after having notified all of his co-adventurers, whose trustee he was, of all the facts and of his intention. He did not abandon the enterprise but negotiated continuously for the acquisition of the property, so that in two days after Heslet had served him with notice of the repudiation of its contract by the Caplice Company and Allen had served Hosking with notice of Allen's cancellation of their agreement, the purchase of the property by Allen, through the assignment of the Patten option, had been practically agreed on, the terms having been stated, which were reduced to writing and signed by the Pattens the next day, and this writing was then taken to Chicago by Allen and later executed by him. Neither were the options re-assigned to Hosking though the documents themselves were delivered to him. They had been recorded and Allen appeared as the owner of record. No attempt was made to notify Pilkey of the changed situation. He was in Chicago, in entire ignorance of what his trustee and his associates were doing, and it seems to have been assumed that his interest could be entirely disregarded.

It is argued that the notice to Hosking was notice to Pilkey because they were partners. If Pilkey was Hosking's partner it was only as he was the partner of Allen and of Hand in this enterprise. The contract was entered into by four individuals in their individual names. It is true that it provides that one-third of the stock in the cor-

poration to be formed shall go to Pilkey and Hosking, one-third to Allen and Hand and one-third to Allen, trustee. This, however, did not make Pilkey and Hosking partners in one-third of the stock. They were to be merely joint owners, so far as the contract shows. A partnership implies a union of money, property, labor or skill, or some or all of them, for some purpose of commerce or business and a sharing of profits or loss. (3 Kent's Com. 23.) Here was no such purpose. The corporation was to be formed for such purpose, but the stockholders, whether they owned their stock jointly or severally, would not be partners. It does not appear that Pilkey and Hosking ever were partners. The trust agreement recites that Hosking had an option from the John Caplice Company on behalf of himself and Pilkey, but mere tenancy in common or joint ownership of property does not make the owners partners. Even if it be granted that they were partners in the single transaction of these options, no terms of any contract are shown from which the conclusion can be drawn that after they had disposed of the only property owned in common the partnership continued. The assignment of the options to Allen as trustee disposed of the entire subject matter of the partnership, if any existed. Thereafter they were entitled jointly to one-third of the stock of the corporation to be formed, but their relation had none of the characteristics of partnership. Their venture, whatever may have been its character, had terminated and become merged in the new agreement, and their partnership, if one had existed before, was terminated when that agreement was made. Allen, as trustee, could not purchase the subject matter of the trust and hold it for his own benefit so long as that relation existed, and he could only relieve himself of its obligation as to any beneficiary of the trust by notice brought home to such beneficiary. Since Pilkey had no such notice the trust continued in force as to him and he is entitled to share in the benefit of Allen's purchase.

On Allen's return from Montana he gave Pilkey a copy of the notice to Hosking, but he then had in his possession the proposition for an assignment to himself by the Pattens of the options on the terms substantially agreed upon before he left Butte. On August 21 Pilkey sent to Black, at Pittsburg, a telegram as follows: "Do you want Trout, Montana? Pilkey and Hosking made settlement with owners. Others wanted it for half. Ans." The appellants contend that this was a recognition of the failure, rescission and abandonment of the agreement of July 25. It cannot be regarded as an acquiescence in the abandonment of that agreement. So far as appears, Pilkey's only knowledge of what had occurred in Montana was contained in the copy of the notice which Allen gave him. His telegram to Black was an inquiry,—a request for information,—and not a waiver.

Hosking on August 9, the day after Allen had notified him of the cancellation of their agreement and the attorney whom Allen had employed had advised him that his Caplice Company lease was void because Heslet was without authority from the board of directors to execute it, sued Heslet for $100,000 damages because of Heslet's false representation and warranty that he had authority from the Caplice Company to execute such lease. On August 29 he brought suit against the Pattens to compel them to assign all their interest in the Gem mining claim to him and surrender possession of it to him. On October 25, 1917, he executed a release to the Pattens, in which, after reciting the lease and option given to him by the Pattens, the extension of it, his suit against the Pattens, the existence of a controversy between him and the Pattens relating to the contracts and agreements mentioned in the release touching their validity and their interpretation, and a mutual agreement between the parties, among other things, that such contracts, and each of them, shall be rescinded and held for naught and that all matters of controversy be-

tween the parties shall be mutually settled and adjusted, it is agreed that the agreements of May 23 and June 18, 1917, (the lease and option to Hosking and the extension of it,) be rescinded and held for naught, and that Hosking shall never claim any rights because of them against the Pattens or their assignees of the leases and options described, or their transferees or grantees of any interest in them or the mining ground and premises described in them. This is the release referred to in the fifth plea of the appellants and it constitutes a complete defense as to Hosking. The suit against the Pattens on account of the Gem mine was settled for one-third of the $2200 profit which the Pattens made by its sale, and this amount was paid to Hosking at the time the release was signed and was all that he received. It was sought to avoid the effect of the release by showing that Hosking did not read it or know its contents but signed it in reliance upon his attorney. A statement was made by counsel on the hearing which it was agreed should be accepted as a pleading, and it was further agreed that the evidence should be heard and considered by the court as if a cross-bill had been filed for the reformation of the release. The decree confines the operation of the release to the Gem claim and treats the release as reformed to that extent. The language of the release is so specific that there can be no doubt as to its legal effect. It includes copies of the various instruments with which it deals. It is long and contains some unnecessary verbiage and some repetition, but it would be a careless reader who would fail to grasp its intention to release the Pattens and their assigns from any claim growing out of the option given to Hosking on the Trout and Gem claims. It was prepared by the Pattens' attorney on September 15 in his office in the presence of Hosking and his attorney and the Pattens, under instructions there given in the presence of all, and the attorney who prepared it testified that it was drawn in accordance with what was said by the parties. It was approved

by Hosking's attorney. It was not executed until six weeks later, after Allen had come to Montana and given a dep-- osition which Hosking and his attorney desired. If Hosking did not know its contents his negligence was inexcusable, and there is no evidence of the mutual mistake or fraud which is necessary to the reformation of written instruments.

The decree was right in holding that in all the matters involved Hand and Allen were entitled to an equal share and that Pilkey was entitled to a one-sixth interest so far as the Trout and Gem properties are concerned, but the release given by Hosking should have been held binding on him and he should be excluded from any share.

After Allen returned to Chicago he obtained from the Midvale Steel and Ordnance Company the money necessary to acquire and operate the Trout and Gem and other properties and the Western Ore and Mining Company was formed. No further attention was paid by Allen to the contract of July 25, but he treated it as wholly abandoned and entirely ignored any interest of the other parties to it. The stock of the Western Ore and Mining Company was equally divided between Allen and the Midvale Steel and Ordnance Company, each owning 500 shares of its capital stock of 1000 shares. It operated the Trout and Gem mines and made contracts for and handled the ore from various other claims and mines. Several months later Allen conveyed to it the Trout and Gem properties, as has been already stated, and other property was transferred to it. It is impracticable to divide the stock of this company according to the contract of July 25. There are included among its assets and capital, property other than that mentioned in the contract and profits derived from other sources, in none of which were Pilkey or Hosking entitled to any interest, and because of this confusion of property, brought about by the acts of Allen and the Western Ore and Mining Company, it would be impossible to determine

the respective rights of the parties as to any shares of stock. Since Allen held the Trout and Gem claims charged with a trust in favor of Pilkey and Hand the Western Ore and Mining Company took them charged with the same trust, and a court of equity may grant relief to the beneficiaries of the trust by following the trust property and decreeing it to be held for the benefit of the beneficiaries.

The appellants insist that the Midvale Steel and Ordnance Company is a necessary party to the suit because its interest is affected by the decree. That company is the owner of one-half of the stock of the Western Ore and Mining Company, and it is insisted that taking away a portion of the fee of the mines from the latter company materially affects the interests of the former. It may be true that the value of the assets of the Western Ore and Mining Company will be reduced, but the only manner in which the Midvale Steel and Ordnance Company can be affected will be indirectly in its capacity as a stockholder, and in this capacity its interests are represented by the former company. The stockholders of a corporation are not necessary or even proper parties to a suit against a corporation which affects the stockholders only in their character as stockholders and not as individuals. (*Ward* v. *Farwell,* 97 Ill. 593; *Singer* v. *Hutchinson,* 183 id. 606.) The corporation represents the stockholders in all actions regarding the rights and obligations of the corporation, and it is only where relief is sought against the stockholders individually that they are necessary parties. In this case the relief is directly against the corporation and not against the stockholders and they were not necessary parties.

The appellants object to the provisions of the decree which require the appellants to produce before the master and leave with him until otherwise directed all their books of account, papers and writings relating to the accounting and to pay all costs to the date of the decree and the expenses of the reference. The order for the production of

books of account and writings was proper. The order for the payment of costs theretofore incurred was within the discretion of the court, but the order for the expenses of the reference was premature.

The decree will be reversed and the cause will be remanded, with directions to render a decree consistent with this opinion. *Reversed and remanded, with directions.*

---

(No. 13236.—Appellate Court reversed; superior court affirmed.)
ELSPETH M. CONNER, Plaintiff in Error, *vs.* THE BORLAND-GRANNIS COMPANY, Defendant in Error.

*Opinion filed June 16, 1920—Rehearing denied October 7, 1920.*